Welch, J.
The single question is, whether the plaintiff in error had power to condemn and appropriate the land in controversy.
If the power exists, it must be found in the charter of the company, the general corporation act of 1852 now in force, under which the company was organized. S. & C. 275. All powers of this nature .granted by the act are contained in sections 21, 27, and 28. Do these sections authorize the condemnation for the purposes and under the circumstances set forth in the pleadings ? The sections referred to are as follows:
“Seo. 21. Said corporation shall be authorized to construct and maintain a railroad with a single or double track, with such sidetracks, offices, and depots as they may deem necessary, *commencing at or within, and extending to, or into any town, city, or village named as the place of the termini of such road, and construct branches from the main line to other towns or places within the limits through which said road may pass.”
“ Sec. 27. Said corporation is authorized to enter upon any land for the purpose of examining and surveying its railroad, and may appropriate so much as may be deemed necessary for its railroad, including necessary side-tracks, depots, and work-shops, and water-stations, materials for construction, except timber, a right of way over adjacent lands sufficient to enable the company to construct and repair its road, and the right to conduct water by aqueducts, and the right of making proper drains.
“ Sec. 28. That whenever any railroad company heretofore incorporated, or which may be hereafter incorporated, shall find it necessary for the purpose of avoiding annoyance to public travel, or dangerous or difficult curves or grades, or unsafe or unsubstantial grounds or foundations, or for other reasonable causes, to change *360 the location or grade of any portion of their road, whether heretofore made or hereafter to be made, such railroad companies shall be, and are hereby authorized to make such changes of grade and lo■cation, not departing from the general route prescribed in the certificate of such company; and for the purpose of making any such change in the location and grades of any such road, as aforesaid, .such company shall have all the right, powers and privileges, to enter upon and take and appropriate such lands and make surveys necessary to effect such changes and grades, upon the same terms, and be subject to the same obligations, rules, and regulations as are prescribed by law ; and shall also be liable in damages, when any have been caused by such change, to the owner or owners of the lands upon which such road was heretofore constructed, to be ascertained and paid or deposited as aforesaid; but no damages shall be allowed, unless claimed within thirty days after actual notice of such intended change shall be given to such owner or owners, if residing on the premises, or notice by publication in some newspaper in general circulation in the county, if non-resident.”
Prior to 1848 there was no provision of law allowing a change *of the location or grade of a road ; and under laws granting powers substantially the same as those contained in said sections 21 and 27, this court held that a road having been once located and built, the company had no power to relocate the road; all its powers in that respect being exhausted. See Moorehead v. Little Miami R. R. Co., 17 Ohio, 351, and Little Miami R. R. Co. v. Naylor, 2 Ohio St. 238. Immediately after the decisions of these cases, the legislature, by the law of 1848, granted the power to change the location •and grade of roads. These several provisions are'brought together for the first time in the act of 1852; and the question in the present ■case is upon their true meaning as regards alterations in, or additions to, the road, less than, or other than, by a change of its location or grade—such as making new side-tracks, or th,e like.
Counsel for defendants insist that the principle settled in the •cases referred to—that is, that the power once exercised becomes exhausted—applies as well to the construction of new side-tracks, or other such appendages of the roadj as it does to the malting of a new road, or a change of the location of .the road; and they say, that as the power supplied in section 28 is confined to changes in the location or grade of the road, there is no continuing power to condemn land for such new side tracks. Although the company can *361 •move its entire road, including side-tracks, depots, and the like, and locate them in another place, it can not change or add to its sidetracks without a new grant from the legislature. It can make a new road, but not a new side-track.
It is true that grants, of this nature, being in derogation of private right, must be strictly construed. If, therefore, there is rea■sonabe ground of doubt as to whether the legislature intended to .grant the continuing power claimed to be exercised here, the doubt .should be resolved against the company, and it must go back to the law-making power for a new grant—a grant of power to change, or add to its side-tracks, depots, water-tanks, etc., etc., as the necessities of business require. Is there such reasonable ground of doubt ? We think there is not. Taking these provisions together, and construing them in the light of the historical fact, that a ^railroad —that is, a useful and valuable railroad—-is not a stationary thing, but grows with the growth of the country, it seems clear to us that the legislature must have meant to grant the power claimed.
The power to make “ necessary side-tracks,” prima facie, is the power to make them when they are necessary. Otherwise it would be the power to make unnecessary side-tracks. Prima facie power to do any act, is power to do it in such manner and at such time as is usual, convenient, and reasonable-—in such way as prudent men manage their own concerns. Tried by this rule, there can be no ■serious doubt of the meaning of sections 21 and 27, by themselves considered. And we think that meaning is made plainer by section 28, and the general provisions of the act.
Here is a law granting full power to any and all persons, without restriction as to time, to form new companies, and, as such, to condemn any and all lands which may be necessary for such roads as they choose to build; with power also to change the entire location of their roads, after they have been built, and to condemn anew lands for that purpose. Under either form of power the land in controversy is liable to be condemned at any time. Now why , should the legislature thus expose the land in controversy, and, in fact, all land in the state, to condemnation, for a new road, or for a change of the location of an old one, and yet shield it from being appropriated to a “side-track,” which might become indispensable to the proper use of an existing road ? I confess I can imagine no good reason for such legislation, or for couching it in the language of sections 21 and 27, if such was intended. Why should the legis *362 lature grant the greater power, and one rarely to be exercised—the-power to change the location of the road itself—and refuse the less-power, and that which is of constantly-recurring necessity—the power to change the mere appendages, accidentals, and conveniences of the road ? Why permit so much condemnation of private-land, for the building of the road, and then have the road fail of its-full and ultimate usefulness, for want of a side-track ? It is a case-where the greater power ought to be held to include the less. No wise legislator would grant the one *and refuse the other. To do so, would be to lose sight of the obvious policy of our railroad laws. That policy could have been nothing less than the establishment 'and maintenance of a system of railroads, that should be adequate to the business of the country. The object could not have been to rest satisfied with the construction and maintenance-of inferior roads, and such as should remain stationary, and dwarfed and crippled in their operation and usefulness. The legislature-must have intended that Ohio should have a system of roads-of which she would not be ashamed, and that would keep pace with the improvements of the country and the age. In carrying out. this policy, improvements of the road are as important as its original construction, or changes of its location or grade; and it seems as necessary to prevent the selfish owner, who refuses a fair price for his land, from standing in the way of the improvement of the road, as of the road itself. Purchase and sale is no certain and reliable substitute in either case, for the power of condemnation. The fact of the existence of the power often induces a sale, where otherwise it could not be effected at all, or on any reasonable terms. If the selfish should not be allowed to veto the construction of roads, they should not be allowed to veto their improvement and their usefulness to the publib. That laws of this nature should be construed with strictness in favor of private right is conceded, but it should not be that narrow and niggardly strictness which utterly disregards the admitted policy of a law, and gives strained and secondary meanings to its language, in order to defeat that policy.
Under almost precisely similar legislation, the Supreme Court of Illinois sustained the power sought to be exercised in this case—the power to appropriate land, long after the location and building of the road, for turn-outs, depots, engine-houses, and turn-tables. In the case referred to—Chicago, Burlington and Quincy R. R. Co. v. Wilson, 17 Ill., 127—the court say: “ One of these (views) is, that *363 the road itself having been actually completed and running, the power to condemn land, either for the track of the road or for depot® or other appendages, is exhausted. In this view we can not concur. It would be indeed a disastrous rule to hold that a ^railroad, ^company must, in the first instance, acquire all the grounds-it will ever need, for its own convenience or the public accommodation. Here our railroads are built through extensive districts-of country at present almost entirely unimpx-oved, and which now afford no business whatever, but which are as fertile as any in the-world, and which, ere many years have elapsed, w'ill probably be peopled with an industrious and prosperous population, affording an immense business to the x-oads which pass through them. Probably not one-tenth of the land in the vicinity of this very road is-now in cultivation; but no one acquainted with the subject can doubt that it is destined, at no distant day, to be brought into as high a state-of productiveness as any of the older states. This will increase the population tenfold, and may reasonably be expected to increase the business of the road in the same ratio, and hence there must be a cox-responding increase of the rolling stock to do this increased business—requiring, also, a greater amount of machine-shops for its repair, as well as an increase of depots and other necessary accommodations. We can not suppose that it wa® the intention of the legislature to oblige the company to acquire all the land in the first instance, which, in any event, it should-ever want to do the largest amount of business it may ever hope to attain. The greatest degx-ee of sagacity could hardly detex-mineprecisely what conveniences the future might demonstrate to be neeessax-y to do its business with facility.” To which reasoning it may be added, that it is always the interest of the company to-condemn and appropriate as lax-gely as practicable at the time of constructing the road, as land is then comparatively cheap, and will almost certainly appreciate by the building and use of the road. There is much more danger that the company will appropriate too much ground, than that it will hot appropriate enough, at the inception of its road. The temptation is strong to acquire-lands beyond the necessities of the road, with a view to speculation. Often they are obtained gratuitously, on condition that the road, or its depots, are to be located upon or near them. Whereas, the only inducement to the postponement of their condemnation till a futux-e day, must be, either the bona fide belief that they can- *364 *never be needed for tbe road, or the hope of being compelled to pay to a selfish owner what the road adds to the value of. his lands, There seems, therefore, very little ground to apprehend that this continuing power to add to and improve the appendages and incidentals of the road, where necessity requires its exercise, will be abused, or wantonly or oppressively exercised. If the contrary should prove to be the case, the legislature can easily supply a remedy. They can do so, perhaps, by a simple provision, submitting to the same tribunal that determines the amount' of compensation, the question whether, under all the circumstances, the .appropriation is reasonably necessary and for the (Dublin good.
Judgment of the common pleas reversed, and judgment of the •probate court affirmed,
Scott, C. J., and Day, White, and Brinkerhoee, JJ., concurred.